# EXHIBIT A

**THE RIGHT TRIAL LAWYERS**
Mark D. Potter (SBN 166317)
mark@trtl.law
James M. Treglio (SBN 228077)
jimt@trtl.law
Isabel Rose Masanque (SBN 292676)
isabelm@trtl.law
Naomi Butler (SBN 332664)
naomib@trtl.law
1410 E Winding Way, Suite B
Friendswood, Texas 77546
(415) 534-0530
Fax: (888) 422-5191

Attorneys for Plaintiffs, on behalf of themselves and all others similarly situated

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF YUBA

| | |
|---|---|
| Joanne Magliocca on behalf of herself and all others similarly situated <br><br> Plaintiffs, <br><br> v. <br><br> United Healthcare Services, Inc, a Delaware corporation; and DOES 1-100, inclusive <br><br> Defendants. | CASE NO. <br><br> **CLASS COMPLAINT FOR VIOLATIONS OF:** <br>    **(1) PENAL CODE § 630 ET SEQ. (CALIFORNIA INVASION OF PRIVACY ACT);** <br>    **(2) WIRETAP ACT, 28 U.S.C. § 2510 *et seq*.** <br>    **(3) CALIFORNIA PENAL CODE § 502 (CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT);** <br>    **(4) ART. 1, § 1, CALIFORNIA CONSTITUTION (INVASION OF PRIVACY); and** <br><br> **DEMAND FOR JURY TRIAL** |

**CLASS COMPLAINT AND DEMAND FOR JURY TRIAL**

Class Representative Plaintiff Joanne Magliocca ("Plaintiff"), by and through her attorneys, individually and on behalf of others similarly situated, allege upon information and belief as follows:

## NATURE OF THE ACTION

1.      Defendant United Healthcare Services, Inc, a Delaware corporation ("Defendant") owns and operates a website, https://www.uhc.com/ (the "Website" or "UHC").

2.      When users visit the Website, Defendant causes trackers and cookies developed by Google, Meta/Facebook, Microsoft, and Adobe (the "Trackers") to be installed on Website visitors' internet browsers. Defendant then uses these Trackers to collect Website visitors' identifying information, as well as dozens of other data points that reveal the users' behavior and activity on the Website, subjecting the user to unwanted and intrusive communications by would be advertisers trying to sell the same or similar product to the user over and over and over again.

3.      Because the Trackers intercept information about the Website visitors' interactions with the Website, the Trackers constitute unlawful wiretapping under Section 2511 of the Electronic Communications Privacy Act ("ECPA") and Section 631 of the California Invasion of Privacy Act ("CIPA").

4.      Because the Trackers also capture Website visitors' "routing, addressing, or signaling information," the Trackers each constitute a "pen register" under Section 638.50(b) of CIPA. See *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023). By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA section 638.51(a).

5.      Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of the ECPA and CIPA.

## PARTIES

6.      Plaintiff Joanne Magliocca resides in Yuba County, California and has an intent to remain there, and is therefore a citizen of California. Plaintiff was in California when she visited the Website.

**FIRST AMENDED COMPLAINT DEMAND FOR JURY TRIAL**

7.     Defendant United Healthcare Services, Inc, a Delaware corporation registered in Minnesota, with its principal place of business located in Minnesota City.

## VENUE AND JURISDICTION

8.     This Court has jurisdiction over this action under California Code of Civil Procedure § 410.10. The aggregated amount of damages incurred by Plaintiff and the Class exceeds the $25,000 jurisdictional minimum of this Court. The amount in controversy as to the Plaintiff individually and each individual class member does not exceed $75,000, including interest and any pro rata award of attorneys' fees, costs, and damages. Venue is proper in this Court under California Code of Civil Procedure §§ 395(a) and 395.5 because Defendants do business in the State of California and in the County of Yuba. Defendants have obtained personal information about Plaintiff in the transaction of business in the County of Yuba, which has caused both obligations and liability of Defendants to arise in the County of Yuba.

## I. FACTUAL BACKGROUND

### A. The California Invasion of Privacy Act

9.     The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

10.     Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." In re Google Inc., 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); see also Greenley, supra, 2023 WL 4833466, at *15 (referencing CIPA's "expansive language" when finding software was a "pen register"); Javier v. Assurance IQ, LLC, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has

**COMPLAINT AND DEMAND FOR JURY TRIAL**

construed CIPA in accordance with the interpretation that provides the greatest privacy protection." Matera v. Google Inc., 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

11.     Individuals may bring an action against the violator of any provision of CIPA—including CIPA sections 630 and 638.51—for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

**B. The Federal Wiretap Act**

12.     The ECPA was originally enacted in October 1986 to extend privacy protections to emerging technologies. In drafting the legislation, Congress acknowledged that "[t]he dramatic development of the Internet has transformed methods of gathering, processing and sharing information." Senate Judiciary Committee Report (S. Rep. No. 99-541, 1986). Therefore, the statue aimed to address "individuals' concerns that a sufficient degree of privacy and the integrity of personal information are maintained in an age of modern communications and information storage." Id.

13.     Although limiting overreach by law enforcement was one of the main purposes of the statute, the ECPA explicitly applies to private actors, including "any individual, partnership, association, joint stock company, trust, or corporation" who illegally intercepts, or attempts to intercept, "the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device. 18 U.S.C.A. § 2510(4)(6).

14.     The statute authorizes individuals to recover civil damages of up to $10,000 from any person who violates the provisions of the ECPA.

**II. DEFENDANT ILLEGALLY INTERCEPTS THE CONTENTS OF ELECTRONIC AND WIRE COMMUNICATIONS AND ILLEGALLY CAPTURES IDENTIFYING INFORMATION**

**A. Third-Party Tracking Technology on the Website**

15.     Tracking technologies, such as those described here, typically function by installing cookies on users' browsers. A cookie is a small text string with data created by a website's server and transmitted to a web browser, which then stores the string on the user's device. When the user revisits the website, the browser sends the string along with the HTTP

3

request, allowing the tracker to recognize the user and build sophisticated profiles. These cookies can remain on the device for years, enabling long-term tracking and profiling.

16.    When the same third-party tracker appears on multiple websites, it can use its cookies to build a comprehensive profile of users by merging data from various sources. This allows for detailed tracking of individuals' browsing habits, preferences, and behaviors across the internet.

17.    Trackers and their associated cookies are installed and operate automatically and invisibly when users visit websites. Users are generally unaware that their data is being collected and shared with third parties or that cookies are storing information on their devices, as the process occurs in the background without any visible signs.

18.    Through the use of these tracking technologies, the Website shares users' identifying information with multiple third parties, including Google, Meta/ Facebook, and Microsoft.

### i. Google's Tracking Technology

19.    Google is one of the largest advertising companies in the country. To date, Google generates nearly 77.8% of its revenue through advertising, bringing in a grand total of $305.6 billion. Google's advertising business has been extremely successful due, in large part, to Google's ability to target people at a granular level.

20.    Defendant collected data on hundreds of individuals who visited its website using tracking software developed by Google, by Google, including Google Analytics. The tracking software is installed by integrating JavaScript code on the website's pages. The tracking code is activated when a user lands on the website. It then proceeds to capture and record various data from the user and transmits the data to Google.

21.    As soon as a user takes any action on a webpage that includes this code, the code embedded in the page redirects the content of the user's communication to Google while the exchange of the communication between the user and website provider is still occurring.

22.    Through this technology, Google can intercept each page a user visits, what buttons they click, how far they scroll on the page, and the length of their session ("events").

4

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Defendant can control the events that allow Google to embed the code that transmits any information about the user's action on the website, which in turn is analyzed for the purpose of delivering targeted advertising.

23.    Google describes how it uses information from websites that use its services as follows:

> For example, when you visit a website that uses advertising services like AdSense, including analytics tools like Google Analytics, or embeds video content from YouTube, your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address. We may use the IP address, for example, to identify your general location, to measure the effectiveness of ads, and, depending on your settings, to improve the relevance of the ads you see. We may also set cookies on your browser or read cookies that are already there.[1]

24.    The following excerpts from Defendant's website illustrate that user behavior, including page views, click patterns, interactions, and ad performance, are all being tracked and collected by Defendant on the Website through Google Analytics and Google Ads (Conversion Linker):

```
_ga (Value - GA1.1.535987668.1754154825)
_gcl_au (Value 1.1.1466334281.1754154465)
```

### ii. Microsoft's Tracking Technology

25.    Defendant also sends user information to Microsoft's analytics and advertising tools ("Microsoft Trackers"). These tools allow site owners to track visitor actions on their websites and measure the effectiveness of their advertising.

26.    Site owners install the trackers by integrating the trackers' source code on their websites. Once the trackers are embedded in a website's source code, they send data regarding specific user actions to Microsoft.

---

[1] https://policies.google.com/technologies/partner-sites?hl=en-US

**COMPLAINT AND DEMAND FOR JURY TRIAL**

27.    The following excerpt from Defendant's website illustrates that Defendant is utilizing session replay technology through Microsoft Clarity in connection with Microsoft Ads to record user behavior, generate heatmaps, and evaluate UI/UX effectiveness on the website:[2]

_uetsid (Value - 776c95e06fc311f08ada7fc5ee424d6d)

_uetvid  (Value - 776c82c06fc311f09300bf77b466f7c4)
_clck (Value - vjpq5e%7C2%7Cfy4%7C0%7C2040)

### iiii.  Meta/Facebook Pixel Tracking Technology

28.    Facebook is a social media platform and social networking service that also offers an advertising and analytics tool called Facebook Pixel. The Meta/Facebook Pixel is a snippet of code integrated into a website that enables businesses to "measure, optimize, and build audiences" for their ad campaigns by tracking user actions and behavior.[3] Once installed, the pixel is activated as soon as a user visits a website.[4]

29.    Facebook explains: "Once matched, we can tally [user] actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns. By default, the Pixel will track URLs visited, domains visited, and the devices your visitors use."

30.    The following cookies installed on the Defendant's website illustrate Defendant's website demonstrates that Defendant is using the Meta/Facebook Pixel to track user behavior, tag user browsers for retargeting, and facilitate behavioral advertising and tracking across platforms. [5]

_fbp – Value (fb.1.1754154579681.88157812894355045)

---

[2] Cookies, such as rxVisitor and dtCookie were present on UHC.com, confirming the use of Microsoft Clarity to record user sessions, clicks, scrolls, and page navigation.

[3] https://www.facebook.com/government-nonprofits/blog/the-facebook-pixel; https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[4] *Id.*

[5] The website utilized Facebook's _fbp tracking cookie, which tags user browsers for cross-platform identification and targeted advertising on Facebook and Instagram.

6

**COMPLAINT AND DEMAND FOR JURY TRIAL**

### iv. Adobe, Inc through its Adobe Analytics Platform

31.    Adobe Analytics[6] is a web analytics platform developed by Adobe Systems. It helps businesses collect, measure, analyze, and visualize user data from websites, mobile apps, and other digital platforms.

32.    Adobe Analytics utilizes various tracking technologies, including cookies and JavaScript code, to collect data about user interactions on a website. The data collected by these trackers is then processed and analyzed within the Adobe Analytics platform[7] to provide insights and reports.

33.    The following excerpt from the source code of Defendant is utilizing Adobe Analytics and the Adobe Experience Cloud platforms. The presence of network requests to domains such as omtrdc.net, adobedtm.com, and demdex.net illustrates that Defendant is employing Adobe tracking technologies to monitor user behavior and support marketing, personalization, and audience segmentation efforts:

```
client=uhc&sessionId=02d12b773fd0491290f1bed1221c32c3&version=2.11.4

d_visid_ver=5.5.0&d_fieldgroup=MC&d_rtbd=json&d_ver=2&d_orgid=8E391C8B533058250A
490D4D%40AdobeOrg&d_nsid=0&ts=1754154463378
```

34.    Because the Trackers intercept information about the Website visitors' interactions with the Website, Defendant's use of the Trackers constitutes an unlawful interception and disclosure of an "electronic communication" under Section 2511 of the ECPA.

35.    Defendant's use of the Trackers also constitutes an "unauthorized connection" which "reads, or attempts to read, or to learn the contents or meaning of [a] message, report, or communication" under Section 631 of CIPA.

---

[6] https://business.adobe.com/in/products/adobe-analytics.html

[7] https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics

7

## III. DEFENDANT ILLEGALLY CAPTURES IDENTIFYING INFORMATION

### A. The Trackers Are "Pen Registers" under Section 638.51

36.     CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

37.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

38.     A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

39.     In plain English, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information.

40.     Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices.

41.     For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address(es) the email was sent to, and the subject line—because this is the user's outgoing information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is incoming information that is being sent to that same user.

42.     Defendant executes each of the Trackers on the user's browser for marketing and analytics purposes, and the Trackers collect information—including users' IP addresses—that

8

**COMPLAINT AND DEMAND FOR JURY TRIAL**

identifies the outgoing "routing, addressing, or signaling information" of the user. Accordingly, the Trackers are each "pen registers."

43. To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" to Defendant's server where the relevant Website data is stored.

44. In response to the request, Defendant's server sends an HTTP response back to the browser with a set of instructions.

45. The server's instructions include how to properly display the Website—e.g., what images to load, what text should appear, or what music should play.

46. In addition, the server's instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address—to Google, Meta/Facebook, and Microsoft.

47. The IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (e.g., 192.168.123.132). The first two sets of numbers indicate what network the device is on (e.g., 192.168), and the second two sets of numbers identify the specific device (e.g., 123.132).

48. Thus, the IP address enables a device to communicate with another device—such as a computer's browser communicating with a server—and the IP address contains geographical location.

49. Through an IP address, the specific device's state, city, and zip code can be determined.

50. Much like a telephone number, an IP address is a unique numerical code associated with a specific internet-connected device or household Thus, knowing a user's IP address—and therefore geographical location— "provide[s] a level of specificity previously unfound in marketing."[8]

---

[8] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA, https://www.accudata.com/blog/ip-targeting/ (last visited January 27, 2025).

9

**COMPLAINT AND DEMAND FOR JURY TRIAL**

51.     An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[9] and (ii) "to target specific households, businesses[,] and even

52.     Individuals with ads that are relevant to their interests."[10] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[11] because "[c]ompanies can use an IP address … to personally identify individuals."[12]

53.     For example, businesses who are trying to reach college-aged demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide Wi-Fis.[13] Or, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[14] In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other forms of advertising."[15] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[16]

54.     In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[17] "By analyzing data on which households or businesses are responding to

---

[9] *Location-based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargetingstrategies/ (last visited January 27, 2025).

[10] 10 Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbertwilliams-z7bhf.

[11] *IP Targeting: Understanding This Essential Marketing Tool*, *supra note 1*.

[12] Trey Titone, the future of IP address as an advertising identifier, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[13] *See, e.g., IP Targeting: Understanding This Essential Marketing Tool, supra note 1.*

[14] *See, e.g., Personalize Your Website And Digital Marketing Using IP Address, GEOFLI,* https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digitalmarketing-campaigns (last visited January 27, 2025).

[15] Williams, *supra note 3.*

[16] *Id.*

[17] *Id.*

**COMPLAINT AND DEMAND FOR JURY TRIAL**

their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[18]

55.     Public IP addresses enable companies to monitor user interactions and behaviors across various websites and construct comprehensive profiles of users' browsing habits and preferences tied to their location.

56.     They are especially effective in identifying and tracking specific individuals. As individuals use their devices across different locations (e.g., home, work, coffee shops, or other places), each location is assigned a distinct public IP address.

57.     By tracking these patterns of movement between different IP addresses, businesses are able to build detailed profiles of individual users' daily routines and behaviors, which allows them to differentiate an individual from others who might be accessing the internet using the same public IP address (e.g., other members of the same household).

58.     For instance, if an individual visits websites on their laptop using their home IP address in the morning, their work IP address during the day, and returns to their home IP address in the evening, this sequence forms a distinctive pattern that can be used to identify that individual.

59.     For these reasons, Europe's General Data Protection Regulation classifies IP addresses as "personal data," since they can potentially be employed "to identify an individual."

60.     In addition to IP addresses, the Trackers also assign users unique identifiers to track user activity across the website. The Trackers also collect browser and device information, geolocation data, and other data, which is then used by Defendant to "fingerprint" individuals across the internet for Defendant's benefit, deriving revenue from the targeted marketing.

61.     Here, the Trackers assign users unique identifiers to allow Defendant and the Trackers to persistently identify and monitor the user across sessions or pages, and to build a behavioral profile of users, including Plaintiff and Class Members.

62.     On information and belief, these behavioral profiles are then sold to third-party advertisers without Plaintiff and Class Members' knowledge or consent.

---

[18] *Id.*

11

**COMPLAINT AND DEMAND FOR JURY TRIAL**

63.     When combined with additional data gathered by trackers, these IP address patterns enable businesses to track specific individuals with notable precision.

64.     The following excerpts from the source code on Defendant's website, along with the cookies installed on the website, demonstrate that third-party trackers are actively collecting unique user identifiers and correlating them across multiple websites and sessions:

id=DC-
11726966&cx=c>m=45fe57v0h2v9181629072za200&tag_exp=101509157~103116026~1032
00004~103233427~104684208~104684211~105033763~105033765~105087538~10508754
0~105103161~105103163

d_visid_ver=5.5.0&d_fieldgroup=MC&d_rtbd=json&d_ver=2&d_orgid=8E391C8B533058250A
490D4D%40AdobeOrg&d_nsid=0&ts=1754154463378

65.     Additionally, Google Analytics can derive demographic information about a user, such as age and gender, by associating the other data collected with the individual users' Google accounts. For example, if the user is logged into their Google account when the user visits UHC's website, Google receives third-party cookies allowing Google to link the data collected by the code to the specific Google user.

66.     Importantly, even if the code collects data about a non-Google user, Google still retains and uses the data collected through the code in its analytics and advertising services. These non-users are referred to as having "shadow profiles" with Google.

67.     Leveraging their access to its social media platform, Facebook Pixel also goes beyond standard event tracking and IP addresses and uncovers the identity of users by matching website visitors to their respective Facebook profiles to later target them with ads on Facebook.

68.     The Trackers are "process" because it is "software that identifies consumers, gathers data, and correlates that data." Greenley, supra, 2023 WL 4833466, at *15.

69.     The Trackers are a "device" because "in order for software to work it must be ran on some kind of computing device." James v. Walt Disney Co., --- F. Supp. 3d --- 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

70.     Because the Trackers capture outgoing information that captures the source of a communication, they are a "pen register" for the purposes of CIPA section 638.50(b).

12

**COMPLAINT AND DEMAND FOR JURY TRIAL**

## C. Defendant Installed And Used The Trackers On Plaintiff's and Users' Browser Without Prior Consent Or A Court Order

71.     Defendant owns and operates the Website, https://www.uhc.com/, which is a retail website that markets, sells, and administers health insurance products and related services. Through the Website, Defendant provides information about its insurance plans, enables users to search for coverage options, obtain quotes, enroll in health plans, and access member services and support.

72.     When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[19]

73.     Often times, third-party scripts are installed on websites "for advertising purposes."[20]

74.     Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[21]

75.     Defendant has long incorporated the code of the Trackers into the code of its Website, including when Plaintiff and other users visited the Website. Thus, when Plaintiff and other users visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

76.     As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the Trackers onto the user's browser so that it can be executed within the context of that website. Scripts, including tracking software, must be (re-)installed into the browser for each website that uses them, and so Defendant is solely responsible for the installation of the tracking software that will execute on its website.

---

[19] *See THIRD-PARTY TRACKING*, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[20] *Id.*

[21] *Id.*

13

**COMPLAINT AND DEMAND FOR JURY TRIAL**

77.     Upon installing the Trackers on its Website, Defendant uses the Trackers to collect the identifying information and user behavior and activity from Class Members.

78.     The operators of the Trackers then use the correlated information of users, including those of Plaintiff and Class Members, to serve targeted advertisements and conduct website analytics.

79.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

80.     Defendant programmed the Trackers to deploy immediately upon a user landing on the Website. As a result, when Plaintiff and Class Members visited the Website, Defendant immediately began collecting their identifying information and tracking their communications with the Website prior to obtaining any form of consent.

**D. Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy**

81.     The collection of Plaintiff's and Class Members' personally identifying, nonanonymized identifying information, and Website activity through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

82.     As alleged herein, the Trackers are designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' data.

**III. PLAINTIFF'S AND THE CLASS MEMBERS' EXPERIENCES**

83.     Plaintiff Joanne Magliocca visited the website in approximately July of 2025 to browse and review the health insurance products and related services offered by Defendant.

84.     Therefore, when Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's browsers. She did not purchase any services or products from Defendant while on the Website.

14

**COMPLAINT AND DEMAND FOR JURY TRIAL**

85. Defendant used the information collected by the Trackers and shared it with third parties to analyze Website data and marketing campaigns, conduct targeted advertising based on Plaintiff's locations, and ultimately boost Defendant's and advertisers' revenue.

86. Plaintiff did not provide prior consent to Defendant to install or use the Trackers on their browser.

87. Defendant did not obtain a court order before installing or using the Trackers.

88. The effects of the Trackers became apparent as Plaintiff was inundated with numerous ads for United Healthcare and other healthcare companies to be found on virtually every website she visited and on social media, such as Facebook and Instagram.

89. Plaintiff has, therefore, had their privacy invaded by Defendant's violations of THE ECPA and CIPA section 638.51(a).

90. Although Defendant uses at least several different Trackers on the Website, they all operate in the same manner and perform the same function, i.e., collecting Plaintiff's and Class Members' identifying information and Website activity. Thus, at any given time a user visits the Website, Defendant will cause one of the Trackers to be installed on users' browsers for the purpose of collecting IP addresses and other event data associated with the Plaintiff and Class Members.

91. Plaintiff and Class Members did not provide their prior consent to Defendant to install or use the Trackers on their browsers.

92. Defendant did not obtain a court order before installing or using the Trackers.

93. Thus, like Plaintiffs, Class Members have also had their privacy invaded by Defendant's violations of CIPA sections 631 and 638.51(a).

## CLASS ACTION ALLEGATIONS

94. Class Representative Plaintiff brings this action on their own behalf and on behalf of all other persons similarly situated.  The putative class that Class Representative Plaintiffs seek to represent is composed of:

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**Nationwide Class**

All United States residents who accessed the Website and had their identifying information and website behavior data collected by the Trackers without consent starting from two years prior to the filing of this Complaint through the date of an order granting class certification and/or a motion for preliminary approval of class action settlement (hereinafter the "Class").

**California subclass**

All California residents who accessed the Website in California and had their identifying information and website behavior data collected by the Trackers without consent and/or despite declining consent starting from one year prior to the filing date of this Complaint through the date of an order granting class certification and/or a motion for preliminary approval of class action settlement (hereinafter the "Subclass").

95. Excluded from the Class are the natural persons who are directors, and officers, of the Defendant, as well as judicial officers, their families, and their staff who are assigned to this action. Class Representative Plaintiff expressly disclaims that they are seeking a class-wide recovery for personal injuries attributable to Defendant's conduct.

96. Plaintiff is informed and believe that the members of the Class are so numerous that joinder of all members is impracticable. While the exact number of the Class members is unknown to Class Representative Plaintiff at this time, such information can be ascertained through appropriate discovery, from records maintained by Defendant.

97. There is a well-defined community of interest among the members of the Class because common questions of law and fact predominate, Class Representative Plaintiff's claims are typical of the members of the class, and Class Representative Plaintiff can fairly and adequately represent the interests of the Class.

98. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

16

**COMPLAINT AND DEMAND FOR JURY TRIAL**

(a)     Whether the Defendant unlawfully read and/or intercepted communications by Plaintiff and members of the Class through use of the Trackers;

(b)     Whether the Defendant unlawfully collected routing, addressing, and signaling information from Plaintiff and members of the Class through use of the Trackers;

(c)     Whether Defendant violated CIPA section 638.51(a);

(d)     Whether Defendant violated the Wiretap Act, 28 U.S.C. section 2510 et seq.;

(e)     Whether the Trackers are "pen registers" pursuant to Cal. Penal Code section 638.50(b);

(f)     Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

(g)     Whether Defendant sought or obtained a court order for its use of the Trackers; and

(h)     Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

Class Representative Plaintiff's claims are typical of those of the other Class members because Class Representative Plaintiffs, like every other Class member, were exposed to virtually identical conduct and are entitled to the same relief under the CIPA.

99.     Class Representative Plaintiff will fairly and adequately protect the interests of the Class.  Moreover, Class Representative Plaintiff has no interest that is contrary to or in conflict with those of the Class they seek to represent during the Class Period.  In addition, Class Representative Plaintiff has retained competent counsel experienced in class action litigation to further ensure such protection and intend to prosecute this action vigorously.

100.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the Defendant in the State of California and would lead to repetitious trials of the numerous common questions of fact and law in the State of California. Class Representative Plaintiff knows of no difficulty that will be

**COMPLAINT AND DEMAND FOR JURY TRIAL**

encountered in the management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

101.   Proper and sufficient notice of this action may be provided to the Class members through a variety of means including direct mail, as well as electronic means such as email, or whatever the Court deems appropriate.

102.   Moreover, the Class members' individual damages are insufficient to justify the cost of litigation, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class. Absent certification of this action as a class action, Class Representative Plaintiff and the members of the Class will continue to be damaged by the practices of Defendant.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violation of the California Invasion of Privacy Act,**

**Cal. Penal Code § 630, et seq.(a)**

**(California subclass only)**

103.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

104.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

105.   The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.

106.   The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, et seq. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal

**COMPLAINT AND DEMAND FOR JURY TRIAL**

liberties and cannot be tolerated in a free and civilized society." Id. § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." Id.

107.    Cal. Pen. Code § 631(a) imposes liability upon: "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section . . . ."

108.    Defendant used tracking software on the Website to intercept and collect information about Website visitors' behavior and activity on the Website.

109.    CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

110.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

111.    The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

112.    At all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers and used the Trackers to collect identifying information of Plaintiff and Class Members, including IP addresses.

113.    Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

19

**COMPLAINT AND DEMAND FOR JURY TRIAL**

114.    Defendant did not obtain a court order to install or use the Trackers.

115.    Pursuant to Cal. Penal Code section 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA section 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA section 638.51(a).

## SECOND CAUSE OF ACTION

### Violation of the Wiretap Act

**Title 1 of the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2510, *et seq*.)**

116.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

117.    The Wiretap Act prohibits the intentional interception, use, and/or disclosure of the contents of any wire, oral, or electronic communication. 18 U.S.C. § 2511(a), (c), (d).

118.    "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. §2510(4).

119.    "Contents" is defined as "includ[ing] any information concerning the substance, purport, or meaning of that communication[.]" 18 U.S.C. § 2510(8).

120.    "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation[.]" 18 U.S.C. § 2510(6).

121.    Plaintiff is an individual and is therefore a "person" for purposes of § 2510(6).

122.    Defendant is a corporation and is therefore a "person" for purposes of § 2510(6).

123.    When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(a) when it installed Trackers on Plaintiff's browsers, which then intercepted and collected Plaintiff's identifying information, as well as dozens of other data points that revealed Plaintiff's and Class Members' behavior and activity on the Website without their consent.

124.    When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(c) when it disclosed Plaintiff's and Class Members' identifying

20

**COMPLAINT AND DEMAND FOR JURY TRIAL**

information, behavior, and activity, obtained from the Trackers to third parties without their consent.

125.    When Plaintiff and Class Members accessed Defendant's website, Defendant violated 18 U.S.C. § 2511(1)(d) when it used Plaintiff's identifying information, behavior, and activity obtained from the Trackers for its own advertising and marketing purposes without their consent.

126.    As a result of Defendant's violations of the Wiretap Act, Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights, loss of their information and loss of money and costs incurred, all of which have ascertainable value to be proven at trial.

127.    Pursuant to 18 U.S.C. § 2520, Plaintiff has been damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA and are each entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and any profits made by Defendants as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) reasonable attorneys' fees and other litigation costs reasonably incurred.

**THIRD CAUSE OF ACTION**

**Violation of the California Computer Data Access and Fraud Act**

**(California Penal Code § 502)**

**(California subclass only)**

128.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

129.    The California Legislature enacted the CDAFA with the intent to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

130.    The Legislature further declared that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the

21

**COMPLAINT AND DEMAND FOR JURY TRIAL**

protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

131.    For purposes of the statute, a number of definitions were provided. The term "access" means to "gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(1).

132.    The term "computer program or software" is defined as "a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions." Cal. Penal Code § 502(b)(3).

133.    The term "computer system" refers to "a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

134.    Plaintiff's and Class members' web browsers used to access the Website are "computer software," and the computers on which Plaintiff and Class members used their web browsers constitute computers or "computer systems" within the scope of the CDAFA.

135.    The statute also defines the term "data" to mean a "representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions." The statute further provides that data may be in "any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

136.    As discussed above, a website cookie, including a third-party tracker cookie, and an IP address are both "data" within the meaning of the statute.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

137.    Under California Penal Code § 502(c)(1), it is unlawful to knowingly access and without permission alter, damage, delete, destroy, or otherwise use any data, computer, computer system, or computer network in order to…wrongfully control or obtain money, property or data. Cal. Penal Code § 502(c)(1).

138.    The statute also makes it unlawful to knowingly access and without permission take, copy, or make use of any data from a computer, computer system, or computer network. Cal. Penal Code § 502(c)(2).

139.    The CDAFA further prohibits any person from knowingly accessing and without permission adding, altering, damaging, or destroying any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. Cal. Penal Code § 502(c)(4).

140.    Under subsections (6) and (7) of Penal Code § 502(c), a person also may not knowingly and without permission (i) provide or assist in providing a means of accessing or (ii) access or cause to be accessed any computer, computer system, or computer network. Cal. Penal Code §§ 502(c)(6) and (7).

141.    Based on Defendant's unauthorized installation and storage of third-party tracker cookies on Plaintiff's and Class members' web browsers, as alleged above, Defendant knowingly accessed and without permission altered and used Plaintiff's and Class members' data and computer systems in violation of Penal Code § 502(c)(1).

142.    Similarly, the installation of the Trackers violates subsection (c)(4) because Defendant added and altered data and computer software on Plaintiff's and Class members' computers or computer systems. Cal. Penal Code § 502(c)(4).

143.    By installing third-party tracker cookies, Defendant also knowingly and without permission provided those trackers a means of accessing and/or caused to be accessed Plaintiff's and Class members' computers, computer systems, and/or computer networks in violation of Penal Code §§ 502(c)(6) and (7).

144.    Further, Defendant's unauthorized collection and disclosure of Plaintiff's and Class members' personally identifying and addressing information to undisclosed third parties

23

**COMPLAINT AND DEMAND FOR JURY TRIAL**

violates Penal Code § 502(c)(2) because Defendant took and made use of data, including IP addresses, from Plaintiff's and Class members' computers, computer systems, or computer networks.

145.   Plaintiff and Class members are citizens of California, and used their computers, computer systems, and/or computer networks in California. Defendant accessed or caused to be accessed Plaintiff's and Class members' data and other personally identifying information from within California.

146.   Defendant was unjustly enriched by accessing, acquiring, taking, and using Plaintiff's and Class members' data and computer systems without their permission or consent, and using all of that identifying information to maximize revenue from selling advertising space on the Website and for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

147.   As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class members have suffered damages. Under Penal Code § 502(e)(1), Plaintiff and Class members are entitled to compensatory damages, injunctive relief, and other equitable relief in an amount to be determined at trial.

148.   Plaintiff and Class members also are entitled to an award of reasonable attorneys' fees and costs under Penal Code § 502(e)(2).

**FOURTH CAUSE OF ACTION**

**Invasion of Privacy**

**(Violation of Art. 1, § 1, California Constitution)**

**(California subclass only)**

149.   The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

150.   "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides as follows: "All people are by nature free and independent and have inalienable rights. Among these are enjoying

24

**COMPLAINT AND DEMAND FOR JURY TRIAL**

and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

151. The right to privacy in California's Constitution creates a right of action against private entities such as Defendant. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of social norms.

152. Plaintiff and Class members have a legally protected privacy interest in their personally identifying information and addressing information that are captured, without notice or consent, when they access and view the Website. These privacy interests are recognized by the California Constitution, CDAFA, CIPA, HIPAA, and numerous other statutes.

153. Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendant would violate state and federal privacy laws. Plaintiff and Class members were not aware of and could not have reasonably expected that Defendant would use website tracking technology and install third-party tracker cookies without notice or obtaining consent. Those unauthorized Trackers collected and transmitted to undisclosed third parties Plaintiff's and Class members' personally identifying and addressing information, including their IP addresses, which contain geolocation data.

154. Defendant's unauthorized (1) installation of the Trackers and (2) collection and disclosure to third parties of Plaintiff's and Class members' personally identifying and addressing information, all without consent or adequate notification to Plaintiff and Class members, are an invasion of Plaintiff's and Class members' privacy.

155. Defendant's conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that (i) the information disclosed by Defendant and shared with third-party trackers was personally identifying information protected by the California Constitution and numerous California and federal statutes; (ii) Defendant did not have authorization or consent to disclose that personally identifying and addressing information, including IP addresses, to any third-party tracker embedded in the Website, and the trackers did

25

**COMPLAINT AND DEMAND FOR JURY TRIAL**

not have authorization to collect and use that geolocation information; and (iii) the invasion deprived Plaintiff and Class members of the ability to control the dissemination and circulation of that information, an ability that is considered a fundamental privacy right. Defendant's conduct constitutes a severe and egregious breach of social norms.

156.    As a direct and proximate result of Defendant's actions, Plaintiff and Class members have had their privacy invaded and have sustained injury, including injury to their peace of mind.

157.    Plaintiff and the Class members seek appropriate relief for that injury, including but not limited to restitution, disgorgement of profits earned by Defendant as a result of or in connection with the intrusions upon Plaintiff's and Class members' privacy, nominal damages, and any and all other equitable relief that will compensate Plaintiff and Class members properly for the harm to their privacy interests.

158.    Plaintiff also seeks such other relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

159.    Plaintiff and the Class hereby demand trial by jury.

### PRAYER FOR RELIEF

WHEREFORE,  Plaintiff and the Class pray  for judgment against Defendants as follows:

1.  For an order certifying the Class, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

2.  For an order declaring that Defendant's conduct violates the statutes referenced herein;

3.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

4.  For statutory damages of $5,000 for each violation of CIPA section 638.51(a);

5.  For statutory damages of $10,000 for each violation of the Federal Wiretap Act;

6.  For pre- and post-judgment interest on all amounts awarded;

7.  For an order of restitution and all other forms of equitable monetary relief; and

26

**COMPLAINT AND DEMAND FOR JURY TRIAL**

8. For an order awarding the Class their reasonable attorney's fees and expenses and costs of suit.

Dated: October 15, 2025                    **THE RIGHT TRIAL LAWYERS**

By: /s/ James M. Treglio
_____
Mark Potter, Esq.
James M. Treglio, Esq.
Isabel Rose Masanque, Esq.
Naomi Butler. Esq.
Attorneys for Plaintiffs

27

**COMPLAINT AND DEMAND FOR JURY TRIAL**